# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00887-COA

**NANNETTE LEIGHANNE SCOTT**                                    **APPELLANT**

**v.**

**CHRIS LE**                                                              **APPELLEE**

DATE OF JUDGMENT:            08/18/2022
TRIAL JUDGE:                 HON. MARGARET ALFONSO
COURT FROM WHICH APPEALED:   HARRISON COUNTY CHANCERY COURT,
                             SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      WILLIAM BRIAN ATCHISON
ATTORNEY FOR APPELLEE:       MARK VINCENT WATTS
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 11/14/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McCARTY AND SMITH, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    After moving to Virginia and getting married, a mother sought physical custody of her young daughter. The father of the child counterclaimed, arguing his family life was more stable and also seeking physical custody. The trial court found in favor of the father. Now the mother appeals, claiming the application of the *Albright* factors was flawed. Finding the chancery court's decision was supported by substantial evidence, we affirm.

## FACTS

¶2.    Nannette Scott and Chris Le never married, but their relationship resulted in a child, Megan,[1] in 2013. At the time of the Megan's birth, Nannette and Chris lived together at

---

[1] We use a pseudonym to protect the privacy of the minor child.

Chris's mother's house in Ocean Springs. The couple stayed there for approximately four months before ending their relationship. After the split, Nannette and her daughter stayed at her grandfather's house in Biloxi. During this time, Megan remained with Nannette during the week, and Chris would have her each weekend. So for really all of Megan's life, her parents lived separately.

¶3. In 2016, the parties agreed to joint legal and physical custody of Megan, which was ratified by the chancery court. The parties agreed to rotate custody during the Thanksgiving holiday as well as split and rotate custody during the Christmas holiday. Additionally, Chris was ordered to pay $200 per month in child support. This arrangement continued until March 2020 when Nannette moved to New Orleans with her then-boyfriend.

¶4. Nannette moved to New Orleans when Megan was six years old. Her motivation was to "provide a better life for [her] daughter," as she was offered a higher-paying job. Because Nannette did not want to "uproot" Megan with only "three months left in the school year," Nannette did not take her daughter with her to Louisiana. Instead, Megan remained with her father in Ocean Springs during the week, and Nannette drove to pick her up each weekend.

¶5. In December 2020, Nannette's boyfriend, a member of the Navy, received orders stationing him at Norfolk, Virginia. Nannette then moved for a second time, joining him in Virginia. The couple married later that same month. Soon after, Nannette joined the Navy herself.

¶6. Throughout the transitions in her mother's life, Megan remained with Chris in Mississippi. In 2021, she visited her mother in Virginia, where she stayed for the summer.

2

¶7. At the end of August that year, Nannette entered boot camp. She did not physically see her daughter until the following summer when Megan visited Virginia again.

## PROCEDURAL HISTORY

¶8. Nannette sought a change in custody in January 2022. She asked the court for sole physical custody of Megan, alleging a material change in circumstances occurred since the original agreed order. Chris counterclaimed, also alleging a material change in circumstances and seeking sole physical custody of Megan.

¶9. After finding a material change in circumstances, the chancery court conducted an analysis to determine the best interest of the child. Both Nannette and Chris testified at trial, as well as Nannette's husband and Chris' mother. After the hearing, the chancery court awarded Chris sole physical custody of Megan. Aggrieved, Nannette appealed.

## STANDARD OF REVIEW

¶10. Our standard of review in child custody cases is limited. *Gateley v. Gateley*, 158 So. 3d 296, 300 (¶19) (Miss. 2015). And "our polestar consideration must be the best interest of the child." *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009). "[I]t is not our role to substitute our judgment for the chancellor's." *Id.* "[W]e must affirm the chancellor's findings of fact if they are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, [or] clearly erroneous or [if the chancellor applied] an erroneous legal standard . . . ." *Gateley*, 158 So. 3d at 300 (¶19) (internal quotation marks omitted).

## DISCUSSION

3

**The *Albright* findings were supported by substantial evidence.**

¶11. Nannette presents us with two assignments of error on appeal, both of which are focused on the same argument: whether the chancery court applied the *Albright* factors correctly.

¶12. Both parties had joint physical custody of Megan prior to the modification proceedings. In cases where modification of joint physical custody is sought, "a material change that makes the arrangement unworkable, such as one parent's relocation" is deemed to be a triggering event. Deborah H. Bell, Bell on Mississippi Family Law § 12.12[5][a], at 468 (3d ed. 2020). Our Supreme Court as well as this Court have long recognized that relocation of one joint custodian "will almost always be a material change in circumstances warranting a change to sole physical custody in one parent." *Id.*; *see Lackey v. Fuller*, 755 So. 2d 1083, 1088-89 (¶27) (Miss. 2000) (finding mother's move to New York made exchange of custody every two weeks inconceivable); *Sobieske v. Preslar*, 755 So. 2d 410, 413 (¶12) (Miss. 2000) (modifying joint custody after mother decided to move to Atlanta); *McRee v. McRee*, 723 So. 2d 1217, 1219-20 (¶11) (Miss. Ct. App. 1998) (finding mother's move to Texas made alternating joint custody impractical).

¶13. Here, both parties sought modification based on Nannette's move to Virginia, arguing it made the original joint custody arrangement "unworkable." This constitutes a material change in circumstances, which requires an *Albright* analysis.

¶14. This Court has long held "that the polestar consideration in child custody cases is the best interest and welfare of the child." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss.

4

1983). "To determine the best interest of the child, Mississippi courts are guided by the factors set forth in *Albright*." *Martin v. Martin*, 282 So. 3d 703, 708 (¶16) (Miss. Ct. App. 2019). The *Albright* factors are as follows:

> (1) age, sex and health of the child; (2) which parent had the "continuity of care prior to the separation;" (3) parenting skills; (4) each parent's "willingness and capacity to provide primary child care;" (5) the parent's employment and its associated responsibilities; (6) physical and mental health and age of the parents; (7) "emotional ties of parent and child;" (8) "moral fitness of parents;" (9) the child's "home, school, and community record;" (10) "preference of the child at the age sufficient to express a preference by law;" (11) "the stability of the home environment and employment of each parent;" and (12) any other "factors relevant to the parent-child relationship."

*Hackler v. Hackler*, 296 So. 3d 773, 777 (¶19) (Miss. Ct. App. 2020) (quoting *Albright*, 437 So. 2d at 1005).

¶15. Nannette attacks most of the factors that were weighed either in favor of Chris or were found to be neutral. We address each challenged factor in turn.

### 1. Age, Sex, and Health of Child

¶16. The chancery court found this factor favored neither parent. Nannette argues this factor should have weighed in her favor. Specifically, she points to the tender-years doctrine, arguing that since Megan "will enter puberty" in a few years she will "need her mother to answer any questions." She also points to Megan's medical documents, arguing she provided the "only evidence presented during trial regarding medical and dental treatment" of the child.

¶17. "However, it is well established that the tender-years doctrine is only a presumption and one of several factors to be considered." *Case v. Case*, 339 So. 3d 796, 804 (¶18) (Miss.

5

Ct. App. 2022) (citing *Mercier v. Mercier*, 717 So. 2d 304, 307 (¶15) (Miss. 1998)).

¶18. By the close of trial, Megan was eight years old. Additionally, Chris testified that he has a large extended family who live about "ten minutes" from one another and "get together often." He also lives with his mother and stepfather, Megan's grandparents.

¶19. Although Nannette presented evidence she had obtained medical treatment for Megan, Chris also testified that he took her to the pediatrician and to the dentist "every three months."

¶20. The chancery court ultimately found this factor favored neither parent. After review, we find that there is substantial evidence to support this conclusion.

### 2. Continuity of Care

¶21. The chancery court found this factor favored Chris because he took care of Megan and all her needs since Nannette's move to New Orleans in 2020. Nannette argues this factor should have weighed in her favor because her work schedule allows her to take better care of Megan. She also asserts that although she was not required to pay child support, she paid for all Megan's needs while the child was with her.

¶22. This Court has affirmed a chancery court's finding in favor of a father as to continuity of care when he "had temporary physical custody of [a child] for the two years preceding the final judgment." *Hackler*, 296 So. 3d at 777 (¶22).

¶23. Chris testified that despite his work schedule, he still takes Megan to school and picks her up. On nights he cannot put Megan to bed because he is working, Chris' parents help out. Chris has lived with his parents for the entirety of Megan's life, and they "work with

6

him" to care for Megan. Chris further testified that he cooks for Megan and helps her get ready for bed and school. He also takes her to the doctor and dentist.

¶24. The chancery court found Nannette had not even physically seen her daughter from August 2, 2021, through May 24, 2022. And since Nannette's move in 2020, she had "not provided any school clothing, school supplies, or child support to Chris" for Megan. The chancery court noted it was clear that she "did not take the initiative to assist in providing for [Megan] after moving to New Orleans despite testifying that she moved for a better job with better pay."

¶25. Given that the undisputed facts showed this factor favored the father, we find no error.

### 3. Parenting Skills

¶26. The chancery court found this factor favored Chris. Nannette claims she has the stronger skills, as shown by taking Megan to get medical treatment for her teeth and for a bone issue with her legs.

¶27. This factor "encompasses a parent's ability to provide physical care, emotional support, discipline, and guidance." Bell, *supra* ¶12, § 12.03[4][a], at 389-90.

¶28. During trial, Chris testified that he takes Megan to both medical and dental appointments and that she goes to the dentist "every three months." He also stated that he and Megan participate in a youth bowling league and play soccer for fun. Chris testified that he participates in Megan's schooling and meets with her teachers. Megan's report card revealed that she was doing well in school, receiving As and Bs in first grade and Bs and Cs in second grade. She received an "Excellent" in all subjects not given letter grades, except

7

for a "Satisfactory" in handwriting.

¶29. Although Nannette did take Megan to the pediatrician and dentist during her 2022 summer visit, she did not tell Chris she was taking Megan to either appointment. And even though Nannette did not work from June 4, 2020, through August 21, 2020, the chancery court found she "did not return to Mississippi to care for her daughter or to exercise joint physical custody."

¶30. We find that the chancery court did not err in its conclusion Chris had stronger parenting skills, as its factual findings were supported by substantial evidence.

### 4. Capacity to Provide Primary Childcare and Employment Responsibilities[2]

¶31. Both parties expressed their willingness and capacity to provide primary care to Megan, and both have steady employment; the chancery court found this factor to be neutral. Nannette now argues this factor should have favored her because her work schedule allows her to be more available to provide primary care for Megan.

¶32. "This Court has previously affirmed a chancery court's finding that this factor was neutral when there was no evidence that a party's employment interfered with their duties as a parent, despite the other party's more flexible work schedule." *Hackler*, 296 So. 3d at 778 (¶33) (citing *Harden v. Scarborough*, 240 So. 3d 1246, 1253 (¶19) (Miss. Ct. App. 2018)).

¶33. Chris works at two different casinos—one during the week and the other during the

---

[2] While the trial court merged two *Albright* factors and combined others, our polestar consideration—as always—is the best interest of the child. From the chancery court's detailed opinion and the record before us, we are assured the findings were within the discretion of the chancery court.

weekend. Despite both jobs, Chris testified that his work schedule allows him to drop off and pick up Megan from school. Because he lives with his mother and stepfather, they have also helped provide care for Megan throughout her life.

¶34. In contrast, Nannette has been employed as an aviation machinist mate in the Navy since August 2021. She works days and is not deployable so long as her husband, who also serves in the Navy, is deployable.

¶35. This is similar to the situation in *Hackler*, where we ultimately affirmed a finding of neutrality. Accordingly, we cannot say the chancery court erred in its finding on this factor.

### 5. Emotional Ties of Parent and Child

¶36. Because the chancery court found Megan had "bonded to both parents," it concluded this factor favored neither parent. Nonetheless, Nannette argues Chris is unable to provide for Megan's emotional needs and implies that she has a stronger emotional bond with the child than Chris does.

¶37. Our courts recognize when "no testimony [is] presented to show that the children ha[ve] a stronger attachment to one parent over the other, then that factor is neutral." *Schmidt v. Schmidt*, 339 So. 3d 163, 178 (¶52) (Miss. Ct. App. 2022) (citing *Hollon v. Hollon*, 784 So. 2d 943, 949 (¶22) (Miss. 2001)).

¶38. The chancery court found "no basis" to support a finding that her emotional bond with Megan was greater than with her father. We agree. The uncontested facts show Chris has parented Megan her entire life, while Nannette did not physically see her daughter for almost ten months. We find no error in the conclusion this factor favored neither parent.

9

### 6. Home, School, and Community Record of the Child

¶39. Nannette's core argument for this section seems to be focused on a grievance that the trial court found "in favor of Chris" even though he "prevented Nannette from having the opportunity to exercise visitation."

¶40. This Court has long acknowledged that "the supreme court has considered it a valid exercise of a chancellor's discretion to consider that a child has more friends and relatives in a particular location when determining the custody of a child." *S.B. v. L.W.*, 793 So. 2d 656, 659-60 (¶17) (Miss. Ct. App. 2001) (citing *Sobieske*, 755 So. 2d at 413 (¶12)).

¶41. Our review of the record reveals the chancery court's analysis was not so cursory. The chancery court heard testimony that Chris had lived with his mother and stepfather in Ocean Springs for five years and that his extended family lived within five to ten minutes of his house, making it easy for them to get together frequently. At the time of trial, Megan was beginning her third-grade year at the same elementary school she attended first and second grades. She is a good student who works hard in school, as reflected by her report cards that were placed into evidence. The court heard "no credible testimony and received no evidence" indicating Chris withheld Megan from Nannette, or that he denied visitation.

¶42. The court further found that Nannette and her husband live in Virginia along with his minor daughter. Neither Nannette nor her husband have family who live nearby. Megan has visited Nannette twice since her move to Virginia—once in the summer of 2021 and once in the summer of 2022.

¶43. Based on these findings, which are supported by substantial evidence from the record,

we find the chancery court did not err in its conclusion as to this factor.

### 7. Stability of the Home Environment

¶44. The court found this factor favored Chris. The general thrust of Nannette's argument as to why this factor should have favored her over Chris is because her "full time guaranteed employment is more stable."

¶45. But that is not what this factor addresses. Chris and Megan have lived in the same house with his mother and stepfather for about five years.

¶46. Nannette and her husband have lived in a townhouse in Virginia for about three years. Her husband recently gained sole custody of his daughter in July of 2021. When Megan visits, she shares a bedroom with her stepsister. Before their move to Virginia, Nannette and Anthony lived in New Orleans for approximately nine months. Nannette lived with her grandfather in Biloxi prior to her move to New Orleans.

¶47. The record supports the chancery court's finding Chris has a more stable home environment.

### 8. Stability of Employment

¶48. The court found this factor favored Chris, though only slightly. Nannette's argument is that the care Chris' mother and stepfather provide to Megan "does not equate to care provided by [him,]" so this factor should have favored her. But again, that is not what this particular factor addresses.

¶49. The chancery court focused on the stability of both parties' employment and found that although Chris has been employed at various casinos since Megan's birth, his work

11

schedule has remained the same since March 2020. He works at two casinos as a table games dealer. At the time of trial, Chris had worked at one casino for about two years and another for about six months.

¶50. Nannette enlisted in the Navy in August of 2021 and serves as an aviation machinist mate. She is not a candidate for deployment because she is on "shore-duty." However, if she were to become deployable, her husband would be placed on "shore-duty" and assigned a day shift due to minor children in the home. Prior to enlisting in the Navy, the court found that Nannette held four different jobs in the span of approximately eighteen months, and worked as a baker for eight years before that.

¶51. We find substantial evidence to support the chancery court's conclusion on this factor. As such, the chancery court did not err in concluding this factor slightly favored Chris.

### 9. Other Relevant Factors to the Parent-Child Relationship

¶52. Nanette challenges the chancery court's findings on this factor but essentially reiterates arguments already addressed above. Her argument heavily restates the facts and is without meaningful analysis of the cases cited.

¶53. This does not conform to our rules. *See* MRAP 28(a)(7) ("The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on"); *Reading v. Reading*, 350 So. 3d 1195, 1199 (¶19) (Miss. Ct. App. 2022) (holding that conformity with the rules "does not simply require a party to mention authority; the authority must be used to **develop the argument in a meaningful way**") (emphasis in original).

¶54.    Because Nannette's argument does not conform to Rule 28(a)(7), it is procedurally barred.

## CONCLUSION

¶55.    The chancery court did not err or abuse its discretion in its application of the *Albright* factors, as its findings were supported by substantial evidence presented at trial.  "[W]e hew closely to our standard of review, which defers greatly to the trial court's findings [because] '[n]ot only did [the chancellor] have the benefit of [the parties'] words, [s]he alone among the judiciary observed their manner and demeanor.'"  *Hackler*, 296 So. 3d at 779 (¶41) (quoting *Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983)).  Therefore, we affirm the chancery court's judgment.

¶56.    **AFFIRMED.**

        **BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR.**